# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-15-00368-CV

**Laura Pressley, Appellant**

**v.**

**Gregorio "Greg" Casar, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT
NO. D-1-GN-15-000374, HONORABLE DANIEL H. MILLS, JUDGE PRESIDING**

---

## NO. 03-15-00505-CV

**David Rogers, Appellant**

**v.**

**Gregorio "Greg" Casar, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT
NO. D-1-GN-15-000374, HONORABLE DANIEL H. MILLS, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

In these related appeals, Laura Pressley and her former attorney, David Rogers, appeal

the trial court's judgment in Pressley's election contest against Gregorio "Greg" Casar declaring

Casar the winner in the December 16, 2014 runoff election for Austin City Council District 4 and awarding sanctions against Pressley and Rogers under Chapter 10 of the Texas Civil Practice and Remedies Code. *See* Tex. Elec. Code § 221.012(a); Tex. Civ. Prac. & Rem. Code §§ 10.001–.006.

## BACKGROUND

Pressley and Casar were among eight candidates for District 4 in the November 4, 2014 general election, the first under Austin's "10-1" council structure.[1] Casar received the most votes, and Pressley finished second. A runoff election was held on December 16, 2014, in which Casar received 64.61% of the vote to Pressley's 35.39%, representing a difference of 1,291 votes. Pressley subsequently raised a number of questions concerning the election with Travis County Clerk Dana DeBeauvoir[2] and ultimately filed a petition for recount with the Texas Secretary of State,[3] requesting a manual recount. *See* Tex. Elec. Code § 212.001. On January 6, 2015, Travis County conducted a manual recount of all ballots cast in the runoff election. Jay Brim, Chair of the Recount Committee, and DeBeauvoir supervised the recount. A representative of the Secretary of State was also present to observe the recount.

Of the 4,417 votes cast in the runoff election, 480 were cast by mail, and 3,937 were cast electronically.[4] Travis County uses the Hart Intercivic eSlate System, an electronic voting

---

[1] In the "10-1" structure, the city is divided into ten districts, each of which elects a council representative, and the mayor is elected citywide.

[2] The City of Austin contracts with Travis County for election services.

[3] The Secretary of State is the state's chief election officer. *See* Tex. Elec. Code § 31.001(a).

[4] Pressley and Casar each received 240 of the 480 votes cast by mail.

2

system certified by the Secretary of State for use in elections and used by the County since approximately 2003. *See id.* §§ 122.001 (prescribing voting system standards), .031 (providing that Secretary of State must certify voting system before it may be used in election); 1 Tex. Admin. Code § 81.61 (2016) (Office of the Secretary of State, Conditions for Approval of Electronic Voting Systems) (requiring that voting systems meet or exceed minimum requirement established by Federal Election Commission); *see also Andrade v. NAACP of Austin*, 345 S.W.3d 1, 4 (Tex. 2011) (explaining procedure under Chapter 122 of Election Code for certification of voting system by Secretary of State and adoption of system for use by political subdivision).

The Hart eSlate System is a paperless direct recording electronic machine (DRE), which is "a voting machine that is designed to allow a direct vote on the machine by the manual touch of a screen, monitor, or other device and that records the individual votes and vote totals electronically." *See* Tex. Elec. Code §§ 121.003(12), 129.001–.057 (setting out specific provisions relating to DREs). "DREs store individual votes and vote totals electronically, usually in several places within the unit." *Andrade*, 345 S.W.3d at 4 (internal citation omitted). Upon receipt of a DRE system from the vendor, the custodian of election records must perform additional testing, including hardware diagnostic, logic and accuracy, and security testing. *See* Tex. Elec. Code §§ 129.021–.024; *see also Andrade*, 345 S.W.3d at 4 (describing required testing of DRE system by custodian). In addition, in countywide polling place programs, the Secretary of State requires an audit of each DRE before, after, and if practicable, during each election. *See* Tex. Elec. Code § 43.007(c). The custodian must also create and maintain procedures for inventory, storage, and transport of and access to the DRE equipment. *See id.* §§ 129.051–.053; *see also Andrade*,

3

345 S.W.3d at 5 (describing requirement of secure access). A DRE may not be connected to any external communication device, such as the Internet, or have wireless capabilities, with limited exceptions, and the custodian must create a contingency plan in case of a DRE failure. *See* Tex. Elec. Code §§ 129.054, .056; *see also Andrade*, 345 S.W.3d at 5 (noting requirements regarding external communications and contingency plan). "Although DREs must provide contemporaneous printouts of 'significant election events,' there is no explicit statutory requirement that DREs provide a contemporaneous paper record of each vote cast," despite "repeated efforts to pass such legislation." *Andrade*, 345 S.W.3d at 5 & n.4 (quoting 1 Tex. Admin. Code § 81.62(a), (b) (2016) (Office of the Secretary of State, Continuous Feed Printer Dedicated to the Central Accumulator Audit Log) (requiring real-time audit log of significant events, defined to include error messages and users logging in and out)).

A voter using the eSlate makes his choices by pressing a button to mark boxes next to the name of his chosen candidate in each race. The final screen of the electronic ballot is a list of the races on the ballot with the name of the candidate chosen by the voter (or an indication that no candidate was chosen) for each race. *See* Tex. Elec. Code § 129.002(a) (requiring DREs to provide voter with summary screen before vote is cast). The voter then confirms his vote by pressing the "CAST BALLOT" button. After the voter casts his ballot, the eSlate electronically stores an individual "cast vote record" (CVR), reflecting the votes as shown on the final summary screen before the voter cast his vote.[5] For the manual recount in this case, the CVR for each voter was

---

[5] Pressley and Rogers take issue with whether a CVR is the same thing as a ballot image, as discussed below.

printed and counted by hand. Pressley and her chosen poll watchers witnessed the printing of the CVRs and manual recount. *See id.* §§ 213.013(h) (authorizing candidate and poll watchers to observe recount activity), .016 (providing that each candidate and her poll watchers are entitled to be present during printing of images of ballots cast using DRE voting machines for purposes of recount). According to recount committee chair Brim, the result of the manual recount was that the totals of all precincts matched those in the original canvass, the number of voters matched the number of ballots cast, and the results of the election remained the same. After the recount, Pressley filed several complaints with the Secretary of State. The Secretary of State concluded that "the scope of the recount was conducted properly"; explained the statutory scope of a recount; informed Pressley that challenges based on irregularities, fraud, or mistake are properly made in an election contest; and dismissed Pressley's complaints.

Pressley then filed this election contest against Casar arguing that the eSlate's storage of CVRs does not comply with Election Code requirements because CVRs do not constitute "ballot images" or "images of ballots cast." *See id.* §§ 128.001(a)(2) (requiring that Secretary of State's procedures for use of electronic voting machines must provide for use of system with "main computer to coordinate ballot presentation, vote selection, ballot image storage, and result tabulation"), 213.016 (specifying who may be present during printing of images of ballots cast using DREs for purposes of recount), 232.001–.016 (providing for trial and disposition of election contest). She also asserted allegations of voter disenfranchisement, election irregularities, and criminal violations by election officials. The parties engaged in substantial discovery, including the depositions of Pressley and DeBeauvoir. Casar filed a traditional motion for summary judgment,

5

a no-evidence motion for summary judgment, and a motion for sanctions under Chapter 10 of the

Civil Practice and Remedies Code against both Pressley and Rogers, based on certain repeated

allegations asserted through Pressley's Sixth Amended Contest. *See* Tex. Civ. Prac. & Rem. Code

§§ 10.001–.006. After a hearing on Casar's summary judgment motions, the trial court granted his

no-evidence motion for summary judgment. The trial court subsequently held a two-day hearing on

Casar's motion for sanctions. The trial court granted the motion and awarded monetary sanctions

against Pressley in the amount of $40,000 and against Rogers in the amount of $50,000, as well as

contingent attorney's fees in the event of an unsuccessful appeal. The trial court also ordered that

Pressley and Rogers were to be jointly and severally liable to Casar for expenses of $7,794.44.

Incident to its order, the trial court entered findings of fact and conclusions of law and, at Pressley's

request, entered amended findings of fact and conclusions of law. The trial court then signed an

amended final judgment incorporating the terms of its orders granting summary judgment and

sanctions. These appeals followed.[6]

### APPLICABLE LAW AND STANDARD OF REVIEW

In an election contest, the scope of inquiry by the trial court is limited. The Election

Code provides:

> a) The tribunal hearing an election contest shall attempt to ascertain whether the
> outcome of the contested election, as shown by the final canvass, is not the true
> outcome because:

---

[6] At the request of the parties, the cases were consolidated for purposes of the briefing schedule and oral argument.

(1) illegal votes were counted; or

(2) an election officer or other person officially in the administration of the election:

(A) prevented eligible voters from voting;

(B) failed to count legal votes; or

(C) engaged in other fraud or illegal conduct or made a mistake.

(b) In this title, "illegal vote" means a vote that is not legally countable.

(c) This section does not limit a provision of this code or another statute expanding the scope of inquiry in an election contest.

Tex. Elec. Code § 221.003. A contestant must prove by clear and convincing evidence that a violation of the Election Code occurred and that it materially affected the outcome of the election. *Woods v. Legg*, 363 S.W.3d 710, 713 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *Honts v. Shaw*, 975 S.W.2d 816, 822 (Tex. App.—Austin 1998, no pet.). The outcome of an election is "materially affected" when a different and correct result would have been achieved in the absence of the violation. *Woods*, 363 S.W.3d at 713; *Willet v. Cole*, 249 S.W.3d 585, 589 (Tex. App.—Waco 2008, no pet.). Clear and convincing evidence is that which produces in the factfinder a "firm belief or conviction" as to the truth of the allegations. *In re Lipsky*, 460 S.W.3d 579, 589 (Tex. 2015); *Woods*, 363 S.W.3d at 713. An election contestant's burden is a heavy one, and the declared result will be upheld unless there is clear and convincing evidence of an erroneous result. *Willet*, 249 S.W.3d at 589; *Barrera v. Garcia*, No. 04-12-00469-CV, 2012 Tex. App. LEXIS 7899, at *4 (Tex. App.—San Antonio Sept. 19, 2012, no pet.) (mem. op.).

7

We review a trial court's summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). A movant seeking a no-evidence summary judgment motion must assert that there is no evidence to support an essential element of the nonmovant's claim on which the nonmovant would have the burden at trial. *See* Tex. R. Civ. P. 166a(i); *Hahn v. Love*, 321 S.W.3d 517, 523–24 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Once the motion is filed, the burden shifts to the nonmovant to present evidence raising a genuine issue of material fact as to each of the elements challenged in the motion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). When reviewing a summary judgment, we must take evidence favorable to the nonmovant as true, indulge every reasonable inference in favor of the nonmovant, and resolve any doubts in the nonmovant's favor. *Id.*; *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). A no-evidence motion should be granted when "'(a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact.'" *Southwestern Bell Tel., L.P. v. Emmett*, 459 S.W.3d 578, 589 (Tex. 2015) (quoting *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003)).

Pressley's and Rogers' issues also involve statutory construction, which is a question of law that we review de novo. *See Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011). Our primary concern is the express statutory language. *See Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 867 (Tex. 2009). We apply the plain meaning of the text unless a different meaning is supplied by legislative definition or is

8

apparent from the context, unless the plain meaning leads to absurd results, or unless technical terms are used. *See* Tex. Gov't Code § 311.011(b) ("Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."); *Marks v. St. Luke's Episcopal Hosp.*, 319 S.W.3d 658, 663 (Tex. 2010); *In re E.C.*, 444 S.W.3d 760, 765 (Tex. App.—Fort Worth 2014, no pet.).

**Pressley's and Rogers' Issues**

Pressley and Rogers assert two primary erroneous rulings by the trial court: its ruling on Casar's no-evidence motion for summary judgment and its sanction award. In her first issue, Pressley challenges the summary judgment in favor of Casar, asserting three sub-issues. In his fifth issue, Rogers adopts and incorporates by reference the factual recitations, citations to the record and to authority, and arguments contained in Pressley's first issue. In her second issue, Pressley challenges the trial court's award of sanctions against her, asserting four sub-issues. In his first through fourth and sixth issues, Rogers challenges the trial court's award of sanctions against him. In his fourth and sixth issues, he adopts and incorporates by reference the factual recitations, citations to the record and to authority, and arguments contained in Pressley's second issue, with the exception of her argument concerning the third factor under *Low v. Henry*, 221 S.W.3d. 609, 621 n.5 (Tex. 2007), discussed below. In his first through third issues, Rogers asserts independent arguments and authority. We turn now to Pressley's and Rogers' issues.

**Discovery from Travis County**

In sub-issue one of Pressley's first issue and in sub-issue one of Rogers' fifth issue, Pressley and Rogers argue that the trial court committed reversible error in holding that nonparty

Travis County was not required to provide Pressley access to eSlate information designated as proprietary in Travis County's contracts with Hart. Pressley included in her original, first amended, and second amended petitions a request for production directed to nonparty Travis County. She omitted the request from her third amended petition and served a Notice of Request for Production on Travis County. Pressley did not obtain a court order or serve a subpoena on Travis County, as is required for obtaining discovery from a nonparty. *See* Tex. R. Civ. P. 205.1. Nonetheless, Travis County agreed to provide relevant, non-privileged documents in its possession and sought a protective order seeking to limit the scope of discovery. The trial court entered a third-party discovery control plan allowing substantial discovery, but with some limitations. Concerning production of information that Travis County maintained was proprietary, the order provided that Travis County was to produce its contracts with Hart that prohibited Travis County from disclosing certain information, which formed the basis of the County's objections. Pressley and Rogers did not object to the entry of the order.

Travis County produced numerous documents, including its contracts with Hart and a number of manuals, and attached a privilege log listing certain withheld proprietary information. Although it did not produce the eSlate manual, a Travis County representative later stated on the record that it had produced all of the manuals in its possession. Subsequently, Travis County filed a second motion for protective order and, on the same day, Pressley filed a motion to compel discovery. Pressley complained that Travis County had produced no evidence of claimed privileges and had withheld documents not claimed as privileged. Travis County argued that Pressley continued to seek discovery outside the scope of the trial court's prior discovery order. Central to

10

the discovery dispute was production of the eSlate manual and Pressley's access to various pieces of eSlate equipment "to examine them to determine if they were functioning properly." Pressley's motion to compel discovery was heard at the same hearing as Casar's motions for summary judgment. The trial court granted Casar's no-evidence motion for summary judgment after addressing, but not ruling on, Pressley's motion to compel discovery.

Although Pressley and Rogers complain on appeal of the trial court's third party discovery order, which allowed Travis County to withhold what it considered proprietary information and to provide copies of its contracts with Hart as evidence of the basis for withholding information, Pressley did not object to the entry of that order. Rather, she later filed a motion to compel discovery seeking withheld and "missing" documents. However, when the trial court granted Casar's motion for summary judgment, Pressley did not obtain a ruling or object to the trial court's failure to rule on her motion to compel discovery. Nor did Pressley seek a continuance of the trial court's ruling on the summary judgment motion until it had ruled on her motion to compel discovery. In fact, Pressley's counsel, Mark Cohen, expressly stated, "We will not let this discovery be a cause for continuing the trial."[7]

Pressley and Rogers do not contend that the trial court expressly ruled on the motion to compel discovery but argue that by granting summary judgment without "requiring the Clerk [DeBeauvoir] to get the manual and produce it before ruling on the Motion for Summary Judgment," the trial court "in effect den[ied] the Motion to Compel." However, "[t]he granting of the motion

_____

[7] By the time of this hearing, Pressley had retained additional counsel, who presented argument at the hearing on the motion to compel and all subsequent hearings. Rogers attended but did not present argument.

11

for summary judgment does not necessarily implicitly overrule motions or objections." *Wilson v. Thomason Funeral Home, Inc.*, No. 03-02-00774-CV, 2003 Tex. App. LEXIS 6358, at *11 (Tex. App.—Austin July 24, 2003, no pet.) (mem. op.). Thus, the trial court's ruling on Casar's no-evidence motion for summary judgment did not amount to an implicit denial of Pressley's motion to compel discovery.

Pressley and Rogers also argue that the trial court "cut off the opportunity and obligations on the Clerk [DeBeauvoir] and its own obligation, with respect to the Motion to Compel, by abruptly changing course and granting the No Evidence Motion for Summary Judgment . . . ." They argue that Pressley objected and pointed this error out to the court, citing to a question Pressley's counsel, Cohen, asked the court: "So are you refusing to order [Travis County] to turn over the eSlate manual?" However, Cohen's question to the court challenged the trial court's statements that it considered the request for the eSlate manual moot because Travis County had complied with the trial court's previous order to turn over manuals in its possession and the County could not produce things not in its possession. Thus, Cohen questioned the trial court's *indication of how it intended to rule* on *one aspect* of Pressley's multi-faceted motion to compel discovery; he did not request a ruling on the motion to compel or object to the trial court's failure to rule on the motion. To preserve a complaint for review, a party must timely present it to the trial court with the specific grounds and obtain a ruling or object to the trial court's refusal to rule. Tex. R. App. P. 33.1(a); *Magnuson v. Mullen*, 65 S.W.3d 815, 829 (Tex. App.—Fort Worth 2002, pet. denied) ("If a party fails to [object], error is not preserved, and the complaint is waived.") (citing *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991)(per curiam)); *Mark Prods. U.S., Inc. v. InterFirst Bank Hous.,*

12

*N.A.*, 737 S.W.2d 389, 396 (Tex. App.—Houston [14th Dist.] 1987, writ denied) (holding that appellant waived complaint that trial court failed to compel discovery responses where motion to compel was pending at time of summary judgment hearing and appellant did not obtain ruling on motion or request continuance of summary judgment hearing so that trial court could rule on motion).

Having failed to object to the entry of the third party discovery order, Pressley and Rogers have waived their complaint on appeal as to that order. *See* Tex. R. App. P. 33.1(a); *Magnuson*, 65 S.W.3d at 829. Further, because they also failed to obtain a ruling on Pressley's motion to compel or to seek a continuance on the trial court's ruling on Casar's motions for summary judgment, to the extent Pressley's and Rogers' argument can be construed as a challenge to the trial court's failure to rule on the motion to compel discovery, they have not preserved that issue for appeal. We overrule sub-issue one of Pressley's first issue and sub-issue one of Roger's fifth issue. *See* Tex. R. App. P. 33.1(a); *Mark Prods.*, 737 S.W.2d at 396.

**Trial Court's Review of Summary Judgment Evidence**

In sub-issue two of Pressley's first issue and in sub-issue 2 of Rogers' fifth issue, Pressley and Rogers contend that the trial court committed reversible error by granting Casar's no-evidence motion for summary judgment without reviewing the evidence. We do not find this argument persuasive on the facts before us. Pressley and Rogers appear to base their argument on the trial court's statement that it did not read every page of the summary judgment evidence because "there were too many pages." However, the record reflects that the trial court stated that it had read all of the pleadings, including those filed the morning of the hearing, and "tagged" them, and it

13

specifically mentioned reading Pressley's expert report. Moreover, the trial court stated that it had read the evidence referred to by the parties in the pleadings. "[A] party submitting summary judgment evidence 'must specifically identify the supporting proof on file that it seeks to have considered by the trial court.'" *Nguyen v. Allstate Ins. Co.*, 404 S.W.3d 770, 776 (Tex. App.—Dallas 2013, pet. denied) (quoting *Arredondo v. Rodriguez*, 198 S.W.3d 236, 238 (Tex. App.—San Antonio 2006, no pet.)). "A general reference to a voluminous record that does not direct the trial court and parties to evidence relied upon is insufficient." *Brookshire Katy Drainage Dist. v. Lily Gardens, LLC*, 333 S.W.3d 301, 308 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). "In the absence of any guidance from the non-movant where the evidence can be found, the trial court is not required to sift through voluminous [evidence] in search of evidence to support the non-movant's argument that a fact issue exists." *Nguyen*, 404 S.W.3d at 776 (quoting *Aguilar v. Morales*, 162 S.W.3d 825, 838 (Tex. App.—El Paso 2005, pet. denied)). Because the record reflects that the trial court reviewed the evidence cited by the parties, as well as the pleadings and certain specific evidence, we conclude that Pressley's and Rogers' argument that the trial court committed error by granting summary judgment "without even reading the evidence" is without merit.[8] Further, to the extent the trial court failed to read *all* of the evidence, any such error is harmless in light of our conclusion below that summary judgment was appropriate. *See* Tex. R. App. P. 44.1(a)(1) (providing that for error to be reversible, it must have probably caused the rendition of

---

[8] We also observe that in a number of instances, Pressley referred to exhibits consisting of hundred of pages without citing, quoting, or otherwise pointing out to the trial court the particular evidence on which she relied.

an improper judgment). We overrule sub-issue two of Pressley's first issue and sub-issue two of Rogers' fifth issue.

**Summary Judgment**

In sub-issue three of Pressley's first issue and in sub-issue three of Rogers' fifth issue, Pressley and Rogers argue that the trial court erred in granting Casar's no-evidence motion for summary judgment because Pressley produced more than a scintilla of evidence to create a fact issue as to whether the declared result of the election was the true outcome. *See* Tex. Elec. Code § 221.003(a) (defining scope of inquiry in election contest). They challenge whether Debeauvoir complied with the Election Code's requirement to maintain "ballot images" and contend there were a number of "irregularities." We address these arguments in turn.

### *Ballot Images*

Pressley and Rogers first argue that DeBeauvoir failed to maintain "ballot images" and print them for the election recount as required by the Election Code. Section 128.001 requires that the Secretary of State prescribe procedures to allow for the use of computerized voting systems and that the systems, among other things, have "a main computer to coordinate ballot presentation, vote selection, ballot image storage, and result tabulation." *Id.* § 128.001(a)(2). Section 213.016 refers to the printing of "images of ballots cast" for purposes of recount. *Id.* § 213.016. "Ballot image," "ballot image storage," and "images of ballots cast" are not defined in the Election Code. Pressley and Rogers maintain that construing the term "ballot image" according to common usage, it must mean a picture, reproduction, optical counterpart, visual representation, or exact likeness of

15

the ballot cast. Therefore, they contend, a CVR, which reflects the votes as shown on the final summary screen before the voter casts his vote, is not a ballot image because it is not a picture, reproduction, or exact likeness of the screen on which a voter marks the box next to the name of his chosen candidate in each race. Pressley and Rogers also argue that CVRs cannot be ballot images because they do not have the elements of a ballot required by the Texas Constitution and the Election Code. *See* Tex. Const. art. VI, § 4 (providing that vote shall be by ballot and that legislature shall provide for numbering of tickets); Tex. Elec. Code §§ 52.003 (providing that name of each candidate be placed on ballot), .031 (prescribing form of name placed on ballot), .062 (requiring ballot to be numbered), .063 (requiring designation of election and date on each ballot), .064 (stating that words "OFFICIAL BALLOT" must be printed on each ballot), .070 (providing that voting square and instruction be placed on each ballot). They also argue that there is a fact issue as to the authority of the Secretary of State to define "CVR" as synonymous with "ballot image."

In support of their argument, Pressley and Rogers rely on the "declaration" of Jeffrey Jacobson, Ph.D., Pressley's computer science expert witness, who stated that a CVR cannot be a ballot image because it is a data structure, which is a table or list of information, not an image file, which is a grid of pixels, and because a CVR is never large enough to hold an entire ballot image. Jacobson cited the Federal Election Commission's (FEC's) 1990 Performance and Testing Standard for Punch Card, Mark Sense, and Direct Recording Electronic Voting Systems and stated that "to the extent the FEC discuss[ed] what would later be known as 'cast vote records,' the FEC distinguishe[d] [CVRs] from ballot images." Pressley and Rogers also rely on DeBeauvoir's testimony that the CVR is a stored image of the final summary screen a voter sees before he casts

16

his vote, and not of each screen on which a voter marks the box by the name of his chosen candidate. In support of their argument that DeBeauvoir has failed to comply with the law, they cite evidence that the Hart Voting System is capable of formatting ballot images, i.e., evidence that the eSlate formats a ballot meeting statutory requirements that the voter is shown when deciding for whom to vote and that the Hart Ballot Now System, used for voting by mail, scans each paper ballot to create an exact digital image of the ballot. Based on this evidence, Pressley and Rogers argue that because the legally required ballot images are "missing," the only legal ballots are the mail-in ballots. Consequently, they contend, the recount should have been based only on the mail-in ballots, making the true outcome of the election a tie and authorizing the ordering of a new election. *See id.* §§ 221.001, .012 (authorizing court to declare outcome if it can ascertain true outcome).

We do not find these arguments persuasive. Initially, we observe that the CVR is an image of the screen that the voter sees when he presses the "CAST BALLOT" button. In that sense, the CVR *is* an image of the ballot a voter casts on the eSlate. Further, we disagree with Pressley and Rogers that we must apply the rule of "common usage" and conclude that a "ballot image" must be a picture or exact likeness *of the screen on which the voter decides how to vote*. Nor do we find the opinion of Pressley's expert that a CVR, as a data file, cannot be a ballot image to be determinative. Rather, we must apply the technical meaning the term has acquired as used by agencies in charge of election matters. *See* Tex. Gov't Code § 311.011; *In re E.C.*, 444 S.W.3d at 765. Texas election law does not define "ballot image storage" to require a picture or pixelated copy of an entire ballot, as Pressley and Rogers urge. Rather, federal, state, and local agencies that oversee elections all agree that, under the current state of the law, a CVR is equivalent to a ballot image. The Secretary of State

17

defines a "Ballot Image" as an "Electronically produced record of all votes cast by a single voter,"

and defines a "Cast Vote Record (CVR)" as a "[p]ermanent record of all votes produced by a single

voter whether in electronic or paper copy form. Also referred to as ballot image when used to refer

to electronic ballots."[9] The U.S. Election Assistance Commission (EAC) uses this same language

and indicates that the words can be used interchangeably.[10] It defines "ballot image" as an

"[e]lectronically produced record of all votes cast by a single voter" and adds, "See also: cast vote

record." *See Glossary of Key Election Terminology*, English to Spanish, 2007, U.S. Elections

Commission (2007). The EAC defines "cast vote record" as the "[p]ermanent record of all votes

produced by a single voter whether in electronic, paper or other form. Also referred to as ballot

image when used to refer to electronic ballots." *See id.* DeBeauvoir testified that a CVR and a ballot

image are "the same thing," that her interpretation of the terms is consistent with that of the Secretary

of State and the EAC, that she had worked with that definition since late 2003 as a member of the

EAC Board of Standards that developed the EAC election standards, and that it is the standard

meaning of the term across the United States.

Further, the Secretary of State has certified the Hart eSlate system, which stores CVRs

rather than each page on which a voter makes his selection, and, significantly, the Texas Supreme

---

[9] *See* Glossary, *Electronic Voting System Procedures*, Texas Secretary of State website, available at http://www.sos.state.tx.us/elections/laws/electronic-voting-system-procedures.shtml. In its *Glossary of Elections Terminology*, the Secretary of State also defines "ballot" as "the mechanism for voters to show their vote preferences" in paper or electronic form and "ballot image" as "[t]he ballot as it appears on a direct recording electronic (DRE) voting system." *See Glossary of Elections Terminology*, available at http://sos.state.tx.us/elections/laws/glossary.shtml.

[10] The EAC is an independent, bipartisan commission charged with developing guidelines to meet the requirements of the Help America Vote Act of 2002.

Court has upheld his discretion to do so. In *Andrade*, the Supreme Court addressed complaints that the eSlate does not produce a contemporaneous paper record of each vote. 345 S.W.3d at 4. In rejecting an equal protection challenge to the use of the eSlate, the court noted that "DREs are not perfect. No voting system is" but concluded that "[t]he Secretary made a reasonable, nondiscriminatory choice to certify the eSlate, a decision justified by the State's important regulatory interests. '[N]othing in the constitution forbids that choice.'" *Id.* at 14 (quoting *Weber v. Shelley*, 347 F.3d 1101, 1107 (9th Cir. 2003)). The Election Code prescribes certain minimum standards for voting systems, authorizes the Secretary of State to prescribe additional standards, and gives the Secretary of State the ultimate authority to determine whether a particular voting system meets those standards. *See* Tex. Elec. Code §§ 122.001 (setting out standards and in subsection (c) providing that Secretary of State may prescribe additional standards), .003 (authorizing Secretary of State, upon determination that system does not comply, to limit or prohibit its use), .031 (requiring approval by Secretary of State before voting system may be used), .032 (providing general requirements for approval and authorizing Secretary of State to prescribe more specific requirements), .033 (setting out additional standards), .0331 (same), .038 (providing for determination by Secretary of State of whether system satisfies requirements for approval). The Secretary of State is required to prescribe procedures for implementing and administering elections using computerized voting systems and may modify procedures as necessary to allow the use of an authorized system. *Id.* § 128.001(a), (c). The Secretary of State may also prescribe the form and content of a ballot for an election using a voting system, including one that uses DREs, to conform to the formatting requirements of the system. *Id.* § 52.075.

19

As the chief election officer of the state, the Secretary of State is charged with obtaining and maintaining uniformity in the application, operation, and interpretation of the Election Code and with distributing comprehensive written directives and instructions to state and local authorities who administer election laws. *Id.* §§ 31.001, .003. In implementing this charge as it relates to the certification and use of the Hart eSlate system, the Secretary of State exercised his discretion to define CVR in a manner consistent with that of the EAC and directed election authorities, including DeBeauvoir, to apply that definition. In light of the discretion afforded the Secretary of State in the Election Code and guided by the *Andrade* court's recognition of that discretion and its deference to the legislature on policy matters such as the integrity and vulnerability of DREs, we cannot conclude that DeBeauvoir failed to comply with the Election Code or Texas Constitution when she implemented the use of the Hart eSlate system and followed the Secretary of State's directive to adopt the use of CVRs as ballot images. *See id.* §§ 52.075, 122.001, .003, .031, .032, .038, 128.001(a), (c); *Andrade*, 345 S.W.3d at 14, 16, 18.

Finally, Pressley and Rogers argue that any decision by the Secretary of State that allowed the true outcome of the election to be decided by something other than a numbered ballot would be unconstitutional and that "the evidence eSlate formats a ballot raises at least a fact issue as to whether the Secretary of State had authority under the Texas Election Code § 52.075 to imply in its instructions and definitions that a CVR is synonymous with an image of a ballot as defined in the Election Code." However, to the extent Pressley and Rogers challenge the Secretary of State's authority to adopt the eSlate or to define CVR or ballot image, the authority of the Secretary of State is beyond the scope of an election contest and is not properly before us. *See* Tex. Elec. Code

20

§ 221.003.[11] Taking the evidence favorable to Pressley and Rogers and indulging every reasonable inference and resolving any doubts in their favor, we conclude that Pressley and Rogers did not produce more than a mere scintilla of evidence that DeBeauvoir violated the Election Code by failing to maintain ballot images and print them for purposes of a recount and thus did not meet Pressley's burden to create a fact issue as to whether the outcome of the election is the true outcome. *See id.* § 221.003; *Emmett*, 459 S.W.3d at 589; *Mack Trucks*, 206 S.W.3d at 582; *Dorsett*, 164 S.W.3d 656.

### *Irregularities*

Pressley and Rogers also argue that a series of irregularities in the conduct of the election make the true outcome of the election impossible to determine. They first argue that there were numerous "Invalid/Corrupt" mobile ballot boxes (MBBs). The record reflects that an MBB is a mobile or removable device that is inserted into a judge's controller booth (JBC) prior to voting and stores balloting in the JBC. The JBC is a device that stores the inventory of unvoted ballots, inventory of voted ballots, and access codes that are provided to voters for accessing the voting machines. At the end of voting, the MBB is removed, inserted into a reader, and used to tally votes at the central counting station. Pressley offered evidence that the Tally Audit Log, an audit report printed by Travis County, contained nine error messages reading "Invalid/Corrupt" upon insertion of the MBB into the JBC. Pressley and Rogers contend that these errors, in conjunction with other alleged irregularities, discussed below, make it impossible to say how many illegal votes were

---

[11] As for Pressley's and Rogers' argument that the "Hart Systems are capable of storing images of the ballots cast," they refer to the Ballot Now System, an entirely different system, which is used only for paper ballots in voting by mail and has no bearing on the issue of CVRs as stored on the eSlate System at issue.

21

counted or how many legal votes were not counted. *See* 1 Tex. Admin. Code § 81.62(a), (b)(1) (requiring real-time audit log of significant election events, including error messages).

However, Pressley produced no evidence that the "Invalid/Corrupt" error messages resulted in any legal votes not being counted, resulted in any illegal votes being counted, or otherwise materially affected the outcome of the election. *See* Tex. Elec. Code § 221.003; *Emmett*, 459 S.W.3d at 589; *Mack Trucks*, 206 S.W.3d at 582; *Woods*, 363 S.W.3d at 713. Rather, Pressley's expert witness, Jacobson, stated only that it was "not known" whether the error messages reflected the insertion of nine individual MBBs, multiple insertions of several MBBs, or nine insertions of the same MBB, and he opined that "properly created MBB(s) may have contained legitimate votes, but some event made it/them unreadable" and that the fact that the error messages occurred "near the beginning of a group of MBBs being read warrants further study." This type of expert testimony is based on uncertainty and mere speculation and is therefore unreliable and irrelevant. *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 350 (Tex. 2015) (concluding that expert's opinion that manufacturing process "could" have resulted in contaminated product was unreliable speculation); *see also Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004) (stating that opinion testimony that is speculative is not relevant). Moreover, although DeBeauvoir testified in her deposition that nine such error messages were more than she had heard of before and that she was not certain what had caused those specific errors, she also testified that "you put [the MBB] in once and . . . you know, you put it in a second time and it reads just fine." In a related argument, Pressley and Rogers also contend that the "reader" that tallied the votes was broken. However, the only evidence Pressley produced in support of this allegation is DeBeauvoir's

testimony that she "suspect[ed]" that the MBB error messages may have occurred because there was something wrong with the reader and not the MBBs. This evidence does not constitute evidence that any legal votes were not counted or any illegal votes were counted materially affecting the outcome of the election. *See* Tex. Elec. Code § 221.003; *Emmett*, 459 S.W.3d at 589; *Mack Trucks*, 206 S.W.3d at 582; *Woods*, 363 S.W.3d at 713.

Pressley and Rogers also argue that eSlate "seals were broken[,] bringing the security and accuracy of the MBBs into question." Pressley produced affidavits from poll workers stating that certain eSlates were improperly sealed with "red seals" and that the workers re-sealed them with new "green seals." One worker reported that a seal had to be broken to disconnect the headphones, and another stated that he had to break and replace the seal to remove and replace a broken "wing" on the eSlate. Pressley produced no evidence that any seals were actually broken other than by election officials, who reported their actions, and who broke them only to replace red seals with green seals or to address hardware issues, much less any evidence that issues with the seals resulted in any legal votes not being counted or any illegal votes being counted or materially affected the outcome of the election. *See* Tex. Elec. Code § 221.003; *Emmett*, 459 S.W.3d at 589; *Mack Trucks*, 206 S.W.3d at 582; *Woods*, 363 S.W.3d at 713.

Pressley and Rogers next argue that the Tally Audit Log reflected that the computer that tallies the CVRs was left open on several occasions for extended periods of time. *See* 1 Tex. Admin. Code § 81.62(a), (b)(5) (requiring real-time audit log of significant election events, including users logging in and out of system). In her Sixth Amended Contest, Pressley alleged that because the computer was left open, "anyone with physical access could use the administrator

account to arbitrarily change vote information." DeBeauvoir testified that she did not agree with the characterization by Pressley's counsel, Cohen, of audit log entries as reflecting one week between a user's last activity and his logging out, that she did not know if the audit log was correct as to those entries, that she was uncertain of what the coding on the audit log meant, and that she did not believe that the tally computer had been left open for a week. She further testified about the security measures Travis County uses to guard against tampering and explained that the system is not subject to hacking because it is a closed system, not connected to the Internet. Even assuming, however, that the tally computer remained open for periods of time, Pressley alleged only that someone "could" have accessed the computer and offered no evidence that anyone actually did access the tally computer or that the open computer resulted in any legal votes not being counted or any illegal votes being counted or materially affected the outcome of the election. *See* Tex. Elec. Code § 221.003; *Emmett*, 459 S.W.3d at 589; *Mack Trucks*, 206 S.W.3d at 582; *Woods*, 363 S.W.3d at 713.

The next irregularities Pressley and Rogers assert is that DeBeauvoir instructed her employees not to print zero tapes and results or tally tapes on the day of the runoff election as required by the Secretary of State. Zero tapes are printed when the eSlate is set up at the polls to establish that there are zero votes in the machine next to each name or question on the ballot and again after the election to clear them for use in the next election. Results or tally tapes are printed when the polls close and show the votes next to each name or question. The Secretary of State in the past issued an election advisory instructing election officials to print, sign, and maintain at least one zero tape from each device and at least two copies of the results or tally tape from each device. Pressley produced a letter from the Secretary of State giving Travis County, which uses countywide

24

vote centers—where any voter from any precinct can vote—and conducts joint elections with long ballots, a special dispensation concerning zero and results or tally tapes for the November general election. To avoid delays associated with printing at countywide vote centers, the Secretary of State instructed Travis County to begin printing zero tapes before election day, to print abbreviated zero tapes on election day, and to print abbreviated results or tally tapes called "access code reports" or "access codes" after the polls closed. Pressley also produced a JBC "Judge's Envelope Cover" with the instruction, "DO NOT PRINT THE TALLY." In support of her argument that DeBeauvoir instructed her employees not to print zero tapes, Pressley cited only to allegations in her own pleadings. DeBeauvoir testified that it was because of the Secretary of State's letter instruction to print access codes in lieu of tally tapes that she directed her employees not to print tally tapes. She also testified that, in accordance with the Secretary of State's instructions, Travis County began printing zero tapes prior to election day, printed abbreviated zero tapes at each polling place on election day, and printed access codes at each polling place after the polls closed.

Pressley and Rogers argue that the special dispensation from the Secretary of State applied only to the November general election and that by following abbreviated procedures in the runoff without dispensation to do so, Travis County ignored a critical election security protocol. Thus, they contend, there is no proof that the JBCs contained zero votes when voting began and no proof of the vote totals each candidate received. However, the letter instructing Travis County to use the abbreviated procedures for the November general election was written before the election and before it was known that a runoff election would be required. In the letter, the Secretary of State pointed out that when the abbreviated procedures are used, an election is adequately auditable

through various audit and review steps and that ballot images remain on the voting machines for recounts, contests, and other post-election reviews until archived for the following election. Further, even were we to assume that Travis County lacked special dispensation to print abbreviated zero and results or tally tapes, Pressley produced no evidence that there were any votes on the JBCs before voting began, that any votes were not tallied, or that the use of the abbreviated procedures materially affected the outcome of the election. *See* Tex. Elec. Code § 221.003; *Emmett*, 459 S.W.3d at 589; *Mack Trucks*, 206 S.W.3d at 582; *Woods*, 363 S.W.3d at 713.

Pressley and Rogers next argue that Pressley's statistical analysis of the runoff election results indicates that the results are not believable. They contend that the analysis shows "very unusual and unique mathematical patterns and anomalies" and reveals that the results are erroneous and that the outcome of the election cannot be determined. The alleged anomalies include: (1) the top nine precincts, comprising 80% of the voters, showed exactly the same results for the general and runoff elections (65% to 35%) despite that 600 fewer voters voted in the runoff election; (2) overall results showed exactly the same results for the general and runoff elections (65% to 35%) despite that 4,000 fewer voters voted in the runoff election; and (3) no other runoff race in the past 11 years has shown as tight a distribution between a general election and a runoff election as this race, with a standard deviation of .06%. In her Sixth Amended Contest, Pressley also alleged that there were discrepancies in early voting results, including 28 duplicate entries for ballots by mail that "appear to have been counted twice or three times," early voting reports that were inconsistent with the canvassed results, which is "evidence of systemic errors occurring in the counting," and a discrepancy between the number of voters and the number of votes cast, which is "indicative of

26

several known and documented scenarios of errors and security breaches that can occur with the Hart Electronic Voting System."

However, as shown by the express terms of her Sixth Amended Contest, Pressley alleged only that there "appear" to have been duplicate votes and that voting reports were "indicative" of errors and did not even allege, much less offer any evidence of, any actual duplication of votes or systemic errors. To the contrary, DeBeauvoir testified the post-election audit showed that "[e]verything balanced," that is, "[t]he number of ballots voted matched the number of people who were voting, in that entire picture." Likewise, Jacobson, Pressley's expert, stated only that the "unusual mathematical patterns" were "suspicious" and "warrant[ed] further analysis and testing." As with his testimony concerning the MBBs, Jacobson offered only speculation that something might be wrong. *See Gharda*, 464 S.W.3d at 350; *Coastal Transp.*, 136 S.W.3d at 232. Even assuming that the facts Pressley alleged constitute "very unusual and unique mathematical patterns and anomalies," Pressley asserted only a suspicion of actual irregularity and produced no evidence that there were errors in counting votes or breaches in security, or that the alleged anomalies materially affected the outcome of the election. *See* Tex. Elec. Code § 221.003; *Emmett*, 459 S.W.3d at 589; *Mack Trucks*, 206 S.W.3d at 582; *Woods*, 363 S.W.3d at 713.

The last irregularity Pressley and Rogers assert is that Travis County officials prevented Pressley's poll watchers from viewing the entire process of printing the CVRs from the tally computer for the manual recount. Election Code section 33.056 generally describes poll watchers' observing activity and provides, among other things, that a poll watcher is entitled to observe any activity conducted at the location where the poll watcher is serving and to sit or stand

27

close enough to a member of a counting team to verify that the ballots are read correctly or to a member who is tallying the votes to verify that they are tallied correctly. Tex. Elec. Code § 33.056(b). Section 213.013 provides the same for a recount. *Id.* § 213.013(h). Section 213.016 provides that each candidate and her recount watchers are entitled to be present during the printing of images of ballots cast for purposes of a recount. *Id.* § 213.016. Section 33.061 provides that an official who knowingly prevents a watcher from observing an activity the watcher is entitled to observe commits a Class A misdemeanor. *Id.* § 33.061. Pressley and her recount watchers were allowed to be present during the printing of the CVRs but not during the retrieval and sorting of the CVRs on the tally computer. In her Sixth Amended Contest, under a subsection entitled "Contestant's Official Poll Watchers were Denied Access on Election Night—Four Counts of Criminal Violations Committed by Travis County Elections Officer," Pressley alleged that Michael Winn, Travis County Director of Elections, was informed multiple times that Pressley's poll watchers were being denied access and failed to correct the situation. In the next paragraph, Pressley cited section 33.061. Specifically, Pressley and Rogers complain that Pressley and her recount watchers were not allowed to monitor the integrity of where the CVRs were retrieved, the source where the retrieval occurred, or the copying of the CVR files to an aggregated pdf file, which "they were arguably allowed to do" under sections 33.056 and 213.013.

Section 33.056 provides that poll watchers may observe election activities but does not specifically apply to recounts. *See id.* § 33.056. Section 213.013 applies to recounts and provides generally that poll watchers may observe activities conducted in connection with the recount. *See id.* § 213.013(h). Section 213.016, which was enacted after sections 33.056 and

28

213.013, specifically addresses the printing of images of ballots cast using DREs for purposes of a recount and provides that candidates and their poll watchers are entitled to be present "during the *printing* of the images." *Id.* § 213.016 (emphasis added).

Assuming without deciding that Pressley and her recount watchers were entitled to view the retrieval, sorting, and copying of the CVR files, Pressley and Rogers have failed to explain how the inability of Pressley's poll watchers to view such activity during the recount had any effect on the results of the recount or on the outcome of the runoff election, much less a material effect.[12] *See id.* § 221.003; *Emmett*, 459 S.W.3d at 589; *Mack Trucks*, 206 S.W.3d at 582; *Woods*, 363 S.W.3d at 713; *see also* Tex. R. App. P. 38.1(i) (stating that appellant's brief must contain clear and concise argument for contentions made with citations to authorities and record). They argue that it prevented the poll watchers and therefore the trial court from "being assured the MBBs containing the CVRs were the actual ones produced by the voting machines or the CVRs were being properly tallied." However, this argument—that the poll watchers were unable to determine whether the retrieval, sorting, and copying were done correctly—seems to invert the burden of proof. Pressley's burden was to show that this "irregularity" materially affected the outcome, and it is not sufficient for Pressley and Rogers merely to assert that they were unable to determine if procedures were performed correctly. Pressley did not produce any evidence that the poll watchers' inability to observe the retrieval, sorting, and copying of the CVR files resulted in its being done incorrectly and led to an erroneous result. *See Willet*, 249 S.W.3d at 589. Rather, DeBeauvoir testified that the

---

[12] We also observe that the Chair of the Recount Committee signed a declaration that "the totals in all precincts matched those in the original canvass" and "the number of votes matched the number of ballots cast."

29

post-election audit showed that the number of ballots cast matched the number of voters, and we have already concluded that Debeauvoir did not violate the Election Code in maintaining and printing CVRs as ballot images for the recount. *See Andrade*, 345 S.W.3d at 14, 16, 18. On the record before us, we conclude that the trial court did not err in determining that Pressley did not produce more than a mere scintilla of evidence that any illegal votes were counted, that any legal votes were not counted, or that the outcome of the election was materially affected as a result of these alleged irregularities taken separately or together. *See* Tex. Elec. Code § 221.003; *Emmett*, 459 S.W.3d at 589; *Mack Trucks*, 206 S.W.3d at 582; *Dorsett*, 164 S.W.3d 656; *Woods*, 363 S.W.3d at 713. We overrule sub-issue three of Pressley's first issue and sub-issue three of Rogers' fifth issue.

**Sanctions**

In Pressley's second issue and in Rogers' first through fourth and sixth issues, Pressley and Rogers argue that the trial court abused its discretion in awarding sanctions against them. The trial court imposed sanctions against Pressley and Rogers for violations of Chapter 10 of the Texas Civil Practice and Remedies Code. *See* Tex. Civ. Prac. & Rem. Code §§ 10.001–.006. Chapter 10 allows sanctions, in relevant part, for pleadings that lack legal or factual support. It provides that upon signing a pleading or motion, a signatory attests that:

> (2) each claim, defense, or other legal contention in the pleading or motion is warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; [and]
>
> (3) each allegation or other factual contention in the pleading or motion has evidentiary support or, for a specifically identified allegation or factual contention, is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .

30

*Id.* § 10.001(2), (3). Sanctions may be awarded against a party, the party's attorney, or both, *id.* § 10.004, except that a court may not sanction a represented party under section 10.001(2) for unfounded legal contentions, *id.* § 10.004(d). Casar filed a motion for sanctions against Pressley for violation of section 10.001(3) and against Rogers for violation of sections 10.001(2) and 10.001(3). Following a hearing at which Pressley, Rogers, and DeBeauvoir testified about the election contest and counsel for Casar testified and offered documentary evidence in support of Casar's claim for attorney's fees, the trial court awarded sanctions in the amount of $40,000 against Pressley and in the amount of $50,000 against Rogers. The trial court also awarded contingent appellate fees against Pressley and Rogers—to be paid only if they are unsuccessful on appeal—in the amount of $25,000 for appeal to the court of appeals, $10,000 for filing a petition for review in the Texas Supreme Court, $15,000 if full briefing is requested by the Texas Supreme Court, and $15,000 if oral argument is granted by the Texas Supreme Court. The trial court further ordered that Pressley and Rogers were to be jointly and severally liable to Casar for litigation expenses of $7,794.44.

We review the imposition of sanctions under Chapter 10 for an abuse of discretion. *Nath v. Texas Children's Hosp.*, 446 S.W.3d 355, 361 (Tex. 2014) (citing *Low*, 221 S.W.3d. at 614). A sanctions award will not withstand appellate scrutiny if the trial court acted without reference to guiding rules and principles to such an extent that its ruling was arbitrary or unreasonable. *Id.* (citing *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004)). In determining whether the trial court abused its discretion, we must decide whether the sanctions were appropriate and just under a two-part inquiry. *Id.* at 363. The appellate court must ensure that (1) there is a direct nexus between the improper conduct, the offender, and the sanction imposed, and (2) less severe sanctions would

31

not have been sufficient to promote compliance. *Id.* We do not rely only on the trial court's findings and conclusions but must independently review the entire record to determine if the trial court abused its discretion. *American Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006) (per curiam). We will not hold that a trial court abused its discretion in levying sanctions if some evidence supports its decision. *Nath*, 446 S.W.3d at 361 (citing *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009)). Generally, courts presume pleadings and other papers are filed in good faith. *Id.* The party seeking sanctions bears the burden of overcoming the presumption of good faith. *Id.* With these principles in mind, we turn to the Pressley's and Rogers' issues. Where their issues and arguments coincide, we address them together; where their issues and arguments diverge, we address them separately.

### *Plenary Power of the Trial Court*

In sub-issue one of Pressley's second issue and in Rogers' fourth issue, Pressley and Rogers argue that the trial court did not have plenary jurisdiction to enter the final judgment containing sanctions, rendering the sanctions award void. The trial court signed its original summary judgment order at a hearing held on May 26, 2015. At the request of counsel for Pressley, Cohen, the trial court added "Mother Hubbard" language, indicating that the order resolved all issues and was final and appealable. At the time of the order, Casar's amended motion for sanctions was pending. On June 4, Casar filed a second amended motion for sanctions, and on June 12, he filed a third amended motion for sanctions. On June 24, at the conclusion of the hearing on the motion for sanctions, Casar offered and the trial court signed an amended summary judgment order, which expressly stated that it "amended and replaced" the prior May 26 order. The June 24 order omitted

32

the "Mother Hubbard" finality language and stated that Casar's motion for sanctions remained pending and that the court would consider and decide that motion in a separate order. The trial court stated that it signed the amended order to extend its plenary power until it could rule on the motion for sanctions. On July 23, the trial court signed an order granting Casar's motion for sanctions and an amended final judgment, incorporating the terms of its sanctions order, including the findings of fact and conclusions of law contained therein, and its prior order granting Casar's no-evidence motion for summary judgment.

Pressley and Rogers argue that the June 24 order did not amend the May 26 order because the June 24 order was not a final judgment and that only a motion seeking substantive change will extend the deadlines and the court's plenary power under Rule 329b(g). *See* Tex. R. Civ. P. 329b(g) (providing that timely motion to modify, correct, or reform judgment extends trial court's plenary power). They also argue, without citing authority, that Casar's amended motions for sanctions were not post-judgment motions that extended the trial court's plenary power under rule 329b(g) because they related back to the original, pretrial motion and amended motion for sanctions. We do not find these arguments persuasive and find the cases cited in support of them inapposite on the facts before us.[13]

---

[13] *See Lane Bank Equip. Co. v. Smith S. Equip., Inc.*, 10 S.W.3d 308, 309, 312 (Tex. 2000) (holding that timely filed post-judgment motion for sanctions qualified as motion to modify, correct, or reform judgment under Rule 329b(g) and extended trial court's plenary power); *Schroeder v. Haggard*, No. 04-06-00508-CV, 2007 Tex. App. LEXIS 3725, at *7 (Tex. App.—San Antonio May 16, 2007, pet. denied) (mem. op.) (concluding that trial court's post-judgment letter to counsel requesting hearing did not extend plenary power where trial court did not vacate judgment or issue any further rulings until after its plenary power expired); *Cavalier Corp. v. Store Enters., Inc.*, 742 S.W.2d 785, 787 (Tex. App.—Dallas 1987, writ denied) (holding that nonsubstantive nunc pro tunc correction did not extend plenary power or appellate timetable under Rule 329b(g)).

33

The trial court had plenary power to vacate, modify, correct, or reform its summary judgment order within thirty days after signing the May 26 order. *See id.* R. 329b(d); *Texas Dep't of Transp. v. A.P.I. Pipe & Supply, LLC*, 397 S.W.3d 162, 168 (Tex. 2013). By obtaining the trial court's signature on the amended summary judgment order, which was expressly interlocutory, within thirty days of the original order, Casar prevented the summary judgment from becoming final before the trial court could rule on his motion for sanctions. *See Inglish v. Union State Bank*, 945 S.W.2d 810, 811 (Tex. 1997) (per curiam) (holding that to prevent finality, party was required to ask trial court to correct first summary judgment while it retained plenary power). Assuming without deciding that the trial court's plenary power was not extended by Casar's second and third amended motions for sanctions, it was nonetheless extended by the June 24 order. The June 24 order was signed within the trial court's plenary power and expressly "replaced" the May 26 order; in other words, the trial court in essence vacated the May 26 order and replaced it with an interlocutory order, pending resolution of the motion for sanctions. *See* Tex. R. Civ. P. 329b(d) (providing that trial court may vacate judgment within thirty days after it is signed). On this record, we cannot conclude that the trial court lost its plenary power prior to entering its sanctions order and amended final judgment assessing sanctions.

Pressley and Rogers also argue that because the "Mother Hubbard" language added to the original May 26 order was agreed to in open court and approved by the trial court, it constitutes a Rule 11 agreement. *See id.* R. 11. They cite no authority for this argument and have therefore waived it. *See* Tex. R. App. P. 38.1(i). Even if they had not waived this argument, we would not find it persuasive. To be enforceable under Rule 11, agreements between attorneys and

34

parties must be signed. Tex. R. Civ. P. 11. Neither Pressley and Casar nor their attorneys signed the May 26 order, and we would not conclude that the oral agreement to add the "Mother Hubbard" language is an enforceable Rule 11 Agreement. We overrule sub-issue one of Pressley's second issue and Rogers' fourth issue.

### Sanctions against Rogers

We turn next to Rogers' first and second issues, in which he argues that the trial court abused its discretion in awarding sanctions against him based on bad faith pleadings when, pursuant to Rule 8, Cohen, and not Rogers, was the attorney-in-charge when the fifth and sixth amended contests were filed. *See* Tex. R. Civ. P. 8 (providing that attorney whose signature first appears on initial pleadings shall be attorney-in-charge until designation is changed by written notice to court and parties). Rogers signed the original election contest in January 2015. He signed each amended contest through the Sixth Amended Contest. In April 2015, Pressley filed a Notice of Designation of Lead Counsel, designating Cohen as the attorney-in-charge. *See id.* Because Rogers was not the "attorney-in-charge" for filings after Cohen was designated attorney-in-charge, Rogers argues that Casar lacked standing to obtain sanctions against him.

Casar contends that Rogers waived this issue by failing to challenge the sanctions in the trial court. *See Sterling v. Alexander*, 99 S.W.3d 793, 797 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (concluding that attorney who fails to complain of sanction and ask trial court to reconsider waives complaint about sanction). Rogers concedes that he did not raise this argument below but argues that it is a jurisdictional argument that cannot be waived. *See Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 444–46 (Tex. 1993) (holding that as component of

35

subject matter jurisdiction, standing may be raised for first time on appeal).  He contends that the "real controversy" was between Casar and Cohen, not between Casar and Rogers, and that a judicial declaration about Rogers' conduct would not resolve the controversy between Casar and Cohen.  *See id.* at 446 (stating that general test for standing is that there be real controversy between parties that will actually be determined by judicial declaration sought).

Although we agree that standing may be raised for the first time on appeal, we conclude that Rogers' attorney-in-charge argument has no merit.  Rogers argues that under Rule 8, the attorney-in-charge is the attorney responsible for the suit to the party, responsible for the conduct of the lawsuit for that party, in control of the management of the cause, and the attorney to whom all communications shall be sent.  He cites various actions Cohen took in pursuing the contest as attorney-in-charge.  However, neither Rule 8 nor the cases Rogers relies on in support of this argument address sanctionable conduct under Chapter 10.  *See* Tex. R. Civ. P. 8 (providing that attorney-in-charge is responsible for suit to party and that communications shall be sent to attorney-in-charge); *see, e.g.*, *In Re Users Sys. Servs., Inc.*, 22 S.W.3d 331, 335 (Tex. 1999) (orig. proc.) (addressing whether attorney should be disqualified under Rule 4.02(a) of Texas Disciplinary Rules of Professional Conduct from continuing to represent party for meeting with opposing party whose counsel had not officially withdrawn and concluding that Rule 8 does not address client's right to terminate his counsel's representation); *Joyner v. Commission for Lawyer Discipline*, 102 S.W.3d 344, 347 (Tex. App.—Dallas 2003), no pet.) (addressing lawyer discipline and citing Rule 8 as basis for attorney's being attorney of record); *Morin v. Boecker*, 122 S.W.3d 911, 914 (Tex. App.—Corpus Christi 2003, no pet.) (holding that notice from clerk that party was to pay court

36

costs must be served on counsel who is responsible to party for suit under Rule 8 and that notice to party alone was insufficient); *Barnes v. Sulak*, No. 03-01-00159-CV, 2002 Tex. App. LEXIS 5727, at *16–17 (Tex. App.—Austin 2002, pet. denied) (observing that "[t]he designation of an attorney in charge serves primarily to alert the court and other parties who is responsible for the conduct of the lawsuit for that party—i.e., where documents should be sent, through whom the party should be contacted, and who is authorized to file documents and otherwise represent the party"); *Palmer v. Cantrell*, 747 S.W.2d 39, 41 (Tex. App.—Houston [1st Dist.] 1988, no writ.) (concluding that where single adverse party was represented by two attorneys who were not associated in firm, it was sufficient to serve attorney designated as lead counsel because he has "control in the management of the cause . . . ." (quoting Tex. R. Civ. P. 8)).

Sections 10.001 and 10.004 authorize sanctions against an attorney who signs pleadings that lack any evidentiary or legal basis. *See* Tex. Civ. Prac. & Rem. Code §§ 10.001(2), (3), .004. Section 10.004 limits sanctions to the signatory attorney and a represented party, even when another attorney's name is on the pleading. *Yuen v. Gerson*, 342 S.W.3d 824, 828 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (noting that appellate courts have held that Rule 13 limits sanctions to signatory and party, applying same rule to section 10.004, and holding there was legally insufficient evidence to support sanction against attorney whose name was on pleading but did not sign it). Rogers signed each of the contests filed on behalf of Pressley through the Sixth Amended Contest. The real controversy, then, is between Casar and Rogers, and the trial court had jurisdiction to award sanctions against Rogers. *See Texas Ass'n of Bus.*, 852 S.W.2d at 446. Consequently, the trial court did not err in directing the sanction under Chapter 10 against Rogers.

37

*See Yuen*, 342 S.W.3d at 828 (holding that section 10.004 limits sanctions to signatory attorney and represented party even when another attorney's name is on pleading). We overrule Rogers' first and second issues.

### Chapter 10 Standard/Appropriateness and Justness of Sanction

Having concluded that Rogers was subject to sanctions, we turn to whether the trial court abused its discretion in awarding the sanctions awarded against Pressley and Rogers, and in doing so we must determine whether the sanctions were appropriate and just. *See Nath*, 446 S.W.3d at 363.[14] In the second and third sub-issues of Pressley's second issue and in Rogers' third and sixth issues, Pressley and Rogers argue that Casar did not meet his burden under Chapter 10 to show that there was no legal basis and no evidentiary support for Pressley's claims so as to overcome the presumption that Pressley's pleadings were filed in good faith. *See id.* at 361. Rogers also argues that although the trial court expressly found that Pressley acted in bad faith, it made no such finding as to Rogers. Pressley and Rogers further argue that the trial court failed to determine that there was a direct nexus between any improper conduct and the sanctions imposed, failed to tailor the sanctions to remedy any identified prejudice allegedly caused by the alleged conduct, failed to determine whether lesser sanctions were available to accomplish its goals, and misapplied the factors set out

---

[14] It is undisputed that Pressley was actively involved in preparing her case. She testified that she provided Rogers with facts, conducted research, proposed portions of draft pleadings, reviewed discovery requests and discovery documents, and attended depositions. Chapter 10 contemplates sanctions against a party where appropriate. *See* Tex. Civ. & Prac. Rem. Code § 10.004(a).

38

in *Low* to determine the appropriateness and amount of sanctions. *See id.* at 361; *Low*, 221 S.W.3d at 621 & n.5; *American Flood*, 192 S.W.3d at 583.

"An assessment of sanctions will be reversed only if the trial court acted without reference to any guiding rules and principles, such that its ruling was arbitrary or unreasonable." *Unifund*, 299 S.W.3d at 97. "The trial court does not abuse its discretion if it bases its decision on conflicting evidence and some evidence supports its decision." *Id.* Section 10.001 provides that the signer of each claim or allegation attests that it is based on the signatory's best knowledge, information, and belief, formed after reasonable inquiry. Tex. Civ. & Prac. Rem. Code § 10.001; *Low*, 221 S.W.3d. at 615. "The statute dictates that each claim and each allegation be individually evaluated for support." *Low*, 221 S.W.3d. at 615. "Each claim against each defendant must satisfy Chapter 10." *Id.*

Reviewing the entire record, we conclude that the trial court did not abuse its discretion in awarding sanctions against Pressley and Rogers under Chapter 10 for repeatedly asserting claims that lacked evidentiary and legal support. The trial court based its sanctions award on allegations that Travis County's actions caused widespread disenfranchisement, that zero and results tapes were not printed, that irregularities in the recount materially affected the outcome, and that Travis County election officials committed criminal violations.[15] The trial court concluded that by failing to make reasonable inquiry into whether these allegations were warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law, Rogers

---

[15] The trial court made clear on the record that it was not sanctioning Pressley and Rogers for asserting the argument that CVRs are not "ballot images."

violated section 10.001(2) and that by failing to make reasonable inquiry into whether these claims had evidentiary support, Pressley and Rogers violated section 10.001(3). *See* Tex. Civ. Prac. & Rem. Code § 10.001(2), (3).

Through Pressley's Fifth Amended Contest, she and Rogers alleged that there was widespread "illegal" voter disenfranchisement in the runoff election as a result of Travis County's consolidation of voting locations for the runoff election.[16] DeBeauvoir testified that it is typical for voter turnout to be lower in a runoff election than in a general election and that Travis County changes and consolidates polling locations for runoff elections primarily to save costs. She also testified that the polling locations for the runoff election were approved by the Austin City Council after notice and hearing, and a list of all polling locations was attached to the approved ordinance, posted, and published. DeBeauvoir further stated that District 4 had nine polling locations and that voters could also vote at any of the citywide voting locations.

Pressley and Rogers alleged that closing high-volume locations "prevented eligible voters from voting." In particular, they alleged receiving reports that closure of the Highland Mall location caused "confusion" and "was a problem for voters." They further alleged that "[a] conservative count of disenfranchised voters resulting from the improper/closure/moving/combining of precincts [in District 4] is 1,108." At the sanctions hearing, Pressley testified that she reached that number by counting "people who vote always, always and they were not voting in the runoff." Rogers testified that he had not talked to any voters who had been prevented from voting because of a change in polling locations and that he was "concerned about that issue." At her deposition,

---

[16] Pressley and Rogers omitted this allegation from the Sixth Amended Contest.

Pressley testified that she did not have a list of names of people who were prevented from voting, and she was unable to identify a single voter who was disenfranchised. She stated that she had spoken with people who claimed to have had difficulty in voting but was not able to obtain an affidavit from anyone who claimed to have been disenfranchised. She also testified as to her belief that any inconvenience for a voter caused by a change of voting location was disenfranchisement, including having to drive 20 seconds farther to a different polling location. Five days after Pressley's deposition, Pressley and Rogers filed the Fifth Amended Contest alleging widespread disenfranchisement as a result of closing and consolidation of polling locations. In light of this evidence, the trial court did not abuse its discretion in determining that Pressley and Rogers repeatedly filed Pressley's amended contests, including her Fifth Amended Contest, alleging voter disenfranchisement without any evidentiary support and that Rogers signed the pleadings when they were not warranted by existing law or a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law. *See id.* § 10.001(2), (3); *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015) (noting that trial court abuses its discretion if it rules without reference to guiding rules or principles); *Bennett v. Reynolds*, No. 03-12-00568-CV, 2014 Tex. App. LEXIS 9345, at *51–52 (Tex. App.—Austin Aug. 22, 2014, pet. denied) (mem. op.) (concluding that trial court did not abuse discretion in awarding sanctions under Chapter 10 against party and attorney who persisted in advocating numerous legal theories that were unsupported by facts or law, including allegations of lost business where no summary judgment evidence identified any person who refused to do business with party or any contract lost).

Pressley and Rogers also repeatedly alleged that Travis County election officials committed the "violation" of "not printing" zero and tally tapes for the runoff election and

41

"disregarded" the printing of zero and tally tapes and that "no" zero and tally tapes were printed on election day. They also included in the Sixth Amended Contest the allegation that Travis County election officers disregarded procedure and instructed officials not to print zero and tally tapes on election day. In her deposition DeBeauvoir testified that, in accordance with the letter instruction from the Secretary of State, Travis County began printing zero tapes prior to election day and printed abbreviated zero tapes on election day at each polling place. She further testified that, in accordance with the Secretary of State's instruction, Travis County ran access codes, in lieu of lengthier results/tally tapes, and that for that reason she directed her employees not to print tally tapes. She also testified that both zero and access tapes were produced to Pressley in discovery, and the record reflects that Pressley and Rogers attached a zero tape as an exhibit to Pressley's contests. At the sanctions hearing, DeBeauvoir explained that large counties with long ballots that use countywide vote centers receive dispensation from the Secretary of State to print abbreviated tapes because it would take seven hours per machine to print the full tapes and that she obtained approval from the Secretary of State to print abbreviated tapes in the runoff election. She reiterated that Travis County had printed zero and tally tapes for the runoff election in full compliance with the law. On this record, the trial court did not abuse its discretion in determining that, although Pressley and Rogers disputed whether full, unabbreviated tapes were required for the runoff, there was no evidentiary support or legal basis for the repeated allegations that Travis County printed "no" zero or tally tapes and "disregarded" and "violated" lawful procedure. *See* Tex. Civ. Prac. &. Rem. Code § 10.001(2), (3); *Van Ness*, 461 S.W.3d at 142; *Bennett*, 2014 Tex. App. LEXIS 9345, at \*51–52.

Pressley and Rogers also alleged through the Sixth Amended Contest that numerous procedural irregularities in the recount materially affected the outcome of the election. The alleged

42

irregularities included invalid/corrupt MBBs, broken seals on eSlates, the tally machine left open, statistical "anomalies," and poll watchers' being prevented from observing the "whole process" of printing CVRs for the recount. Prior to filing suit, Pressley filed multiple complaints with the Secretary of State asserting some of these irregularities and others, including that her poll watchers had been precluded from observing the retrieval, sorting, and copying of the CVRs and that there were inconsistencies between the number of voters and the number of votes cast. The Secretary of State concluded that "the scope of the recount was conducted properly" and ultimately informed Pressley that she would not consider any further complaints unless new facts were alleged. Further, as we concluded in our analysis of Pressley's and Rogers' issues challenging summary judgment, Pressley presented no evidence of these irregularities despite extensive discovery. Nonetheless, Pressley and Rogers repeated these allegations in every amended contest through the Sixth Amended Contest. On this record, we cannot conclude that the trial court abused its discretion in determining that there was no factual or legal basis for these allegations. *See* Tex. Civ. Prac. &. Rem. Code § 10.001(2), (3); *Bennett*, 2014 Tex. App. LEXIS 9345, at *51–52.

Finally, the trial court based its sanction award on Pressley's and Rogers' allegations of criminal conduct against Travis County officials for preventing Pressley's poll watchers from viewing the printing of the CVRs, preventing their access to tally tapes, not printing tally tapes, and preventing poll watchers' access to view election activities. The allegation that the poll watchers were prevented from viewing the printing of the CVRs originated from the fact that DeBeauvoir had printed them the day before the recount. Pressley was not agreeable to that procedure, so the printed CVRs were discarded and they were printed again in the presence of Pressley and her poll watchers.

43

Nonetheless, Pressley complained that her poll watchers were not allowed to view the retrieval, sorting, and copying of the CVRs. As discussed above, Pressley included this claim in her complaints to the Secretary of State prior to filing suit. The Secretary of State explained that section 213.016 provides that Pressley and her poll watchers were entitled to be present during the printing of the CVRs but does not provide for their presence during the retrieval, sorting, and copying of the CVRs and that by allowing her and her watchers to be present for the re-printing of the CVRs, Travis County had not violated section 213.016. *See* Tex. Elec. Code § 213.016. The Secretary of State also explained that the recount had been conducted properly. As also discussed above, the repeated allegations that poll watchers were denied access to and that Travis County "did not print tally tapes" ignored the testimony and other evidence that abbreviated tally tapes, called access codes, were printed in lieu of full tally tapes and produced in discovery.

Still, Pressley and Rogers persisted in making these assertions, culminating with an allegation in the Sixth Amended Contest that "Contestant's Official Poll Watchers were Denied Access on Election Night—Four Counts of Criminal Violations Committed by Travis County Elections Officer." They alleged that these activities violated section 33.061 of the Election Code. *See* Tex. Elec. Code § 33.061 (providing that official commits Class A misdemeanor if he knowingly prevents poll watcher from observing activity he is entitled to watch). Immediately prior to citing section 33.061, Pressley and Rogers asserted that these illegal activities had been reported to Winn, as Director of Elections, multiple times and that he had done nothing to correct the situation. On this record, we conclude that the trial court did not abuse its discretion in determining that the allegations of criminal conduct were made against Winn and were made without evidentiary or legal support.

44

*See* Tex. Civ. Prac. &. Rem. Code § 10.001(2), (3); *Van Ness*, 461 S.W.3d at 142; *Bennett*, 2014 Tex. App. LEXIS 9345, at *51–52.

Having determined that the trial court did not abuse its discretion in awarding sanctions, we turn to a determination of whether the sanctions awarded were appropriate and just. Applying the two-part test articulated by the Texas Supreme Court, we must first determine whether there is a direct relationship between the sanctionable conduct, the offender, and the sanction imposed. *Nath*, 446 S.W.3d at 363; *American Flood*, 192 S.W.3d at 583. "[T]he sanction must be visited upon the true offender," and we are to determine "whether the offensive conduct is attributable to counsel only, to the party, or to both." *Nath*, 446 S.W.3d at 363. Pressley and Rogers both argue that they are not the true offender. However, as we have already noted, the evidence shows that Pressley was personally and actively involved in preparing and prosecuting the contest by researching and providing facts to Rogers, reviewing voter data, preparing statistical analyses, proposing portions of draft pleadings, reviewing discovery requests and discovery documents, and attending depositions. She testified that she worked on the case at least ten hours a week and that she provided information to Rogers because she "was the person who experienced the things that [they] put in the petitions." Rogers testified that she was the "most active, hands-on client [he'd] ever had."

As for Rogers, he signed the original and every amended contest pleading. He testified that he was an experienced election contest attorney, but that he had never seen a successful election contest overcome as large a vote margin as in this case. He also testified that he did not talk to any voters who were disenfranchised and was "concerned about that issue." When asked the basis

45

of a legally cognizable cause of action based on the alleged irregularities, Rogers answered only that he "felt that in order for there to be an election contest it was essential to allege mistakes or failure to follow the law." Thus, having concluded that the trial court did not about its discretion in finding that Pressley's and Rogers' conduct was sanctionable, we further conclude that there is a direct nexus between their repeated filing of allegations lacking evidentiary and legal support and the sanctions awarded against Pressley and Rogers and that the trial court therefore did not abuse its discretion in sanctioning them. *See* Tex. Civ. Prac. & Rem. Code §§ 10.001, 004; *Nath*, 446 S.W.3d at 363; *American Flood*, 192 S.W.3d at 583; *Bennett*, 2014 Tex. App. LEXIS 9345, at *51–52.

We next consider whether the amounts of the sanctions were excessive. *See Nath*, 446 S.W.3d at 363. To be just, a sanction must not be excessive and must be no more severe than necessary to satisfy its legitimate purpose. *Id.* Legitimate purposes include securing compliance with the applicable rules, punishing violators, and deterring other litigants from similar misconduct. *Id.* (citing *Spohn Hosp. v. Mayer*, 104 S.W.3d 878, 882 (Tex. 2003)). Courts must consider less stringent sanctions and consider whether they would serve to promote compliance. *Id.* Pressley and Rogers assert in a single sentence that the trial court made no inquiry into or determination that lesser sanctions were available and sufficient to accomplish its goals. They offer no authority or citations to the record in support of this argument and have therefore waived it. *See* Tex. R. App. P. 38.1(i). Even if they had not waived it, we would not find this argument persuasive on this record.

The Texas Supreme Court has set forth guiding rules and principles for assessing the amount of pleadings sanctions. *See Low*, 221 S.W.3d at 620 n.5. The list of nonexhaustive factors the Supreme Court enumerated is:

46

a.  the good faith or bad faith of the offender;

b.  the degree of willfulness, vindictiveness, negligence, or frivolousness involved in the offense;

c.  the knowledge, experience, and expertise of the offender;

d.  any prior history of sanctionable conduct on the part of the offender;

e.  the reasonableness and necessity of the out-of-pocket expenses incurred by the offended person as a result of the misconduct;

f.  the nature and extent of prejudice, apart from out-of-pocket expenses, suffered by the offended person as a result of the misconduct;

g.  the relative culpability of client and counsel, and the impact on their privileged relationship of an inquiry into that area;

h.  the risk of chilling the specific type of litigation involved;

i.  the impact of the sanction on the offender, including the offender's ability to pay a monetary sanction;

j.  the impact of the sanction on the offended party, including the offended person's need for compensation;

k.  the relative magnitude of sanction necessary to achieve the goal or goals of the sanction;

l.  burdens on the court system attributable to the misconduct, including consumption of judicial time and incurrence of juror fees and other court costs;

. . . .

n.  the degree to which the offended person's own behavior caused the expenses for which recovery is sought.

*Id.* (quoting American Bar Association, Standards and Guidelines for Practice Under Rule 11 of the Federal Rules of Civil Procedure, *reprinted in* 121 F.R.D. 101, 104 (1988) (omission in original)).

The *Low* court also noted that the determination of the amount of a penalty to be assessed under Chapter 10 should "begin with an acknowledgment of the costs and fees incurred because of the sanctionable conduct." *Id.* at 621; *see* Tex. Civ. Prac. & Rem. Code § 10.004(c)(3) (authorizing as sanction order requiring sanctioned party to pay reasonable expenses incurred as result of filing of pleading, including reasonable attorney's fees).

At the sanctions hearing, Casar presented evidence of the attorney's fees he incurred, segregated by issues, amounting to more than $193,000. He also presented evidence that he had incurred almost $8,000 in expenses. His attorney testified concerning his experience with election contests and opined that the fees, which were billed at a reduced rate, were reasonable, necessary, and customary in Travis County for the type of service offered. He also testified concerning the *Low* factors and their application to the facts as they related to Pressley and Rogers. Pressley testified concerning her education and assets. She stated that she has a Ph.D. in physical chemistry. Pressley also testified that she had raised approximately $30,000 to $40,000 for the cost of pursuing the election contest, that she and her husband owned property in Wyoming with a net value of between $10,000 and $25,000, that she had sold her home approximately one and one-half years prior to the hearing for $530,000, that she was the sole owner of a business that had approximately $170,000 in its account, that annual sales from her business were approximately $50,000 to $60,000 with an approximate profit margin of 15 percent, that she had a checking account with a balance of approximately $1,000 and that her husband had a checking account with a balance of approximately $5,000, and that her husband's annual income was approximately $130,000 to $160,000. She also testified that Rogers' hourly fee was $350. Rogers testified that he is a practicing attorney

48

experienced in election contests, that he had discounted his fees by $10,000 to $12,000 and billed

Pressley a little more than $75,000, that Pressley had paid him $32,500, and that he had settled the

bill, waiving the remainder of the fees Pressley owed.

The trial court found that Pressley had sufficient assets and that both she and Rogers

had sufficient income potential to pay monetary sanctions, finding that Rogers had waived more than

$40,000 in fees from Pressley. It also considered the *Low* factors, finding nearly all of them

applicable.[17] It cited Pressley's bad faith in making false criminal allegations, the evidence showing

the lack of factual and legal bases for challenging the election outcome, Rogers' experience as an

election contest attorney, the out-of-pocket expenses and fees incurred by Casar, the effect of the

contest on Casar and the performance of his duties as a council member, Pressley's active

involvement in the case, the lack of chilling effect on election contests because the purpose of the

sanction is to encourage compliance with Chapter 10, Pressley's assets and income potential and

Casar's relative lesser income, Pressley's concession that Casar did nothing wrong, and the need for

the magnitude of the sanctions to be sufficient to deter similar contests against the hundreds of other

elected officials in counties using the eSlate.

Pressley and Rogers argue that the trial court misapplied and disregarded the *Low*

factors. We do not agree. We have reviewed the voluminous record, including the evidence

presented at the sanctions hearing that Casar incurred more than $193,000 in attorney's fees, at a

discounted rate. Based on the evidence and the trial court's considered analysis of the *Low* factors,

---

[17] The trial court determined that factor (d) was inapplicable, finding no prior sanctionable conduct, and that factor (*l*) had minimal impact, finding no excessive burden on the court system. *See Low*, 221 S.W.3d at 620 n.5.

we cannot conclude that sanctions in the amounts of $40,000 against Pressley and $50,000 against Rogers were excessive. *See Werley v. Cannon*, 344 S.W.3d 527, 534–35 (Tex. App.—El Paso 2011, no pet.) (concluding that sanction of $12,660 was not excessive where evidence showed party had incurred that amount in attorney's fees); *Sellers v. Gomez*, 281 S.W.3d 108, 116 (Tex. App.—El Paso 2008, pet. denied) (holding that award of $80,000 sanction was not excessive where evidence showed attorney's fees of $81,000 to $82,000); *In re M.I.L.*, No. 02-08-00349-CV, 2009 Tex. App. LEXIS 4645, at *18 (Tex. App.—Fort Worth June 18, 2009, no pet.) (mem. op.), *overruled in part on other grounds by Iliff v. Iliff*, 339 S.W.3d 74 (Tex. 2011) (concluding that sanction of $38,000 was not excessive where evidence showed party had incurred $38,362 in attorney's fee and $2,071.23 in expenses)*; Scott Bader, Inc. v. Sandstone Prods., Inc.*, 248 S.W.3d 802, 817 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (upholding sanction of $68,000 in attorney's fees where evidence showed discovery abuse justified that amount). Rogers also argues that any sanction against him is unjust because, although the trial court expressly found that Pressley had acted in bad faith, it made no such finding as to him. However, sanctions under Chapter 10 do not require a finding of bad faith. Rather, as to Rogers, the standard is whether he signed pleadings certifying that he had made a reasonable inquiry into the legal and factual bases for the allegation contained in the pleading, and good or bad faith is only one of the *Low* factors to be considered in determining the amount. *See* Tex. Civ. Prac. & Rem. Code §§ 10.001, .004. Therefore, the trial court's lack of a finding that Rogers acted in bad faith is not determinative.

While we recognize that the amounts of the sanctions are substantial, we conclude that they are not excessive on the facts before us. The record reflects that Pressley and Rogers

50

continued to assert claims after extensive discovery had shown that the claims had no legal or factual bases. Rogers himself testified that he had not talked to any voters who had been prevented from voting because of a change in polling locations and that he was "concerned about that issue," yet he continued to make allegations in the pleadings of voter disenfranchisement. In particular, the trial court noted its concern with their allegation of criminal conduct asserted late in the proceeding, in the Sixth Amended Contest, and the allegations of voter disenfranchisement based on having to drive 20 seconds farther to a polling place, asserted through the Fifth Amended Contest. Casar presented evidence that he incurred more than $193,000 in attorney's fees and almost $8,000 in expenses in defending the unsupported allegations. Considering that the sanctions were intended not only to reimburse Casar but also to punish Pressley and Rogers and to deter similar conduct in the future, *see Nath*, 446 S.W.3d at 363 (legitimate purposes of sanctions are to secure compliance with rules, punish violators, and deter similar misconduct), the trial court could have reasonably concluded that a lesser sanction would not have served to sufficiently promote compliance and deterrence, and there is some evidence to support the sanctions awards, *see id.* at 361, 363. On the record before us, we cannot conclude that the district court abused its discretion in ordering Pressley to pay Casar $40,000 in attorney's fees, in ordering Rogers to pay Casar $50,000 in attorney's fees, and in ordering them jointly and severally liable to pay $7,794.44 in expenses. *See id.* at 361 (citing *Unifund*, 299 S.W.3d at 97); *American Flood*, 192 S.W.3d at 583. We overrule sub-issues two and three of Pressley's second issue and Rogers' third and sixth issues.

***Attorney's Fees on Appeal***

Finally, we turn to sub-issue four of Pressley's second issue and Rogers' sixth issue, in which Pressley and Rogers argue that the trial court abused its discretion by imposing sanctions based on Casar's attorney's fees in the event of an unsuccessful appeal.[18] They contend that Casar did not request such fees; that there was no evidence of what would be reasonable and necessary attorney's fees in the event of an appeal; that a great portion of the appeal is devoted to the issue of whether a CVR satisfies the requirement of maintaining a ballot image, an allegation for which the trial court did not sanction them; and that awarding sanctions for filing a frivolous appeal is within the exclusive jurisdiction of this Court.

We do not find these arguments persuasive. The matter before us is not a motion for damages for filing a frivolous appeal under the Texas Rules of Appellate Procedure but an appeal of the trial court's sanction award under Chapter 10. *See* Tex. R. App. P. 45. Section 10.004(c)(3) provides that the trial court may award reasonable attorney's fees as a sanction, and a trial court has the discretion to award appellate attorney's fees as a sanction in the event of an unsuccessful appeal. *See* Tex. Civ. Prac. & Rem. Code § 10.004(c)(3); *Law Offices of Windle Turley, P.C. v. French*, 164 S.W.3d 487, 492–93 (Tex. App.—Dallas 2005, no pet.) (rejecting argument that Chapter 10 does not authorize appellate attorney's fees as part of sanctions award). Further, although Casar's counsel testified at the sanctions hearing that the attorney's fees incurred to date were reasonable,

---

[18] It is unclear from Rogers' briefing whether in his sixth issue, he intended to adopt and incorporate by reference the factual recitations, citations to the record and to authority, and arguments contained in sub-issue four of Pressley's second issue. Construing his briefing liberally, we conclude that he did, and we address this issue as to Rogers as well.

necessary, and customary and segregated his fees by issue, these requirements do not apply to the assessment of sanctions based on attorney's fees. *JNS Enter., Inc. v. Dixie Demolition, LLC*, 430 S.W.3d 444, 459 (Tex. App.—Austin 2013, no pet.) (observing that general rules for recovery of attorney's fees do not apply to attorney's fees awarded as sanctions and rejecting contention that attorney's fees awarded as sanctions needed to be segregated); *Scott Bader*, 248 S.W.3d at 816–17 ("In cases in which the judgment is not one for earned attorney's fees, but rather a judgment imposing attorney's fees as sanctions, it is not invalid because a party fails to prove attorney's fees. When attorney's fees are assessed as sanctions, no proof of necessity or reasonableness is required.") (internal citations and quotations omitted); *Miller v. Armogida*, 877 S.W.2d 361, 365 (Tex. App.—Houston [1st Dist.] 1994, writ denied) ("When attorney's fees are assessed as sanctions, no proof of necessity or reasonableness is required."). Instead of applying the general rules for recovery of earned attorney's fees, we review the award of attorney's fees as a sanction for abuse of discretion, reviewing the record for some evidence that supports the trial court's decision.

Here, the record supports the trial court's findings that the allegations on which the sanctions were based—that Travis County's actions caused widespread disenfranchisement, that zero and results tapes were not printed, that irregularities in the recount materially affected the outcome, and that Travis County election officials committed criminal violations—had no legal or factual basis. The trial court expressly stated that it was not sanctioning Pressley and Rogers on the basis of the "legal issue with the ballot . . . that [it] kn[e]w [they were] going to appeal," i.e., the ballot image issue. Thus, the record establishes that the sanction of contingent appellate fees was directed at the appeal of only those issues for which the initial sanctions were imposed. Also, although it was

not required, Casar's attorney testified that his fees were reasonable, necessary, and customary, and he segregated his fees by issue so that there was some evidence of reasonable and necessary fees on appeal and of the relative time required for each issue. Further, the trial court had evidence of the rates billed by Casar's attorney, and it derived the contingent appellate fee awards based on a review of cases involving appellate fee awards. On this record, we cannot conclude that the trial court abused its discretion by awarding appellate attorney's fees in the event Pressley or Rogers filed an unsuccessful appeal in the amounts awarded. We overrule sub-issue four of Pressley's second issue and Rogers' sixth issue.

## CONCLUSION

Having overruled Pressley's and Rogers' issues, we affirm the trial court's judgment.

_____

Melissa Goodwin, Justice

Before Justices Puryear, Goodwin, and Field

Affirmed

Filed: December 23, 2016

54